FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**JAN 0 2 2018**

JAMES N. HATTEN, Clerk
By: *[signature]*
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel. SARAH IMADE and<br>MEASHELLE WASHINGTON<br><br>STATE OF GEORGIA<br>ex rel. SARAH IMADE and<br>MEASHELLE WASHINGTON<br><br>Plaintiff-Relators,<br><br>v.<br><br>DERMATOLOGY AND SKIN CANCER<br>PREVENTION CENTER, INC.;<br>NATIONAL HEALTHCARE CENTER<br>LLC; STANLEY DAVID BRYANT, M.D.;<br>AVERIL JOHNSON; and ALLERGY<br>HEALTH MD,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**1:18-CV-0004**

Civil Action No: _____
Jury Trial Demanded
FILED UNDER SEAL

## COMPLAINT

Relators Sarah Imade and Meashelle Washington, on behalf of themselves,

the United States of America, and the State of Georgia, bring this action under 31

U.S.C. §§ 3729-3732 ("False Claims Act") and O.C.G.A. §§ 49-4-168.1 *et seq.*

("State False Medicaid Claims Act") to recover all damages, penalties, and other

remedies established by the False Claims Act on behalf of the United States and

themselves, and the State False Medicaid Claims Act on behalf of the State of

Georgia and themselves, and would show the following:

## JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, as amended, 31 U.S.C.

§§ 3729 *et seq.*, and the State False Medicaid Claims Act, O.C.G.A. §§ 49-4-168.1

*et seq.*

2.      This court has subject matter jurisdiction over this action pursuant to 31

U.S.C. § 3732(a), 31 U.S.C. § 3732(b), and 28 U.S.C. § 1331.

3.      This court has personal jurisdiction over Defendants and is a proper venue

pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) in that Defendants do or

transact business in this jurisdiction and the violations of the False Claims Acts

described herein were carried out in this district.

## THE PARTIES

4.      Defendant Dermatology & Skin Cancer Prevention Center, Inc. ("DSCPC")

is a medical office registered as a professional corporation in the state of Georgia.

Its principal office is located at 1215 Eagles Landing Parkway, Suite 205,

Stockbridge, Georgia 30281.

5.      From approximately 2014 through September 2017, Defendant Dr. Stanley

Bryant was the owner and operator of DSCPC.

6.      No other physician has been employed at DSCPC since approximately 2013.

-2-

7.     In or about September 2017, DSCPC was acquired by Averil Johnson, owner and CEO of National Healthcare Center LLC ("NHCC"), to be a second NHCC location.

8.     NHCC's principal office address is 3330 S. Cobb Dr. Ste B, Smyrna, GA 30080.

9.     NHCC's website advertises various healthcare services including urgent care, primary care, heart care specialists, diagnostic imaging, physical therapy, dermatology, and allergy services.

10.    NHCC's 3330 S. Cobb Dr. address is also the address for a company called Allergy Health MD, which upon information and belief is Johnson's allergy services company.

11.    Since at least 2015, Johnson has distributed allergy tests and immunotherapy antigens to DSCPC.

12.    Relator Meashelle Washington worked at DSCPC as a medical assistant and back office supervisor from February 2008 through November 2017.

13.    Relator Sarah Imade worked at DSCPC as a Supervisor Medical Assistant from October 2011 through November 2017. As part of her job, Ms. Imade performed allergy testing and immunotherapy services for patients, including verifying insurance and preparing superbills for claims for payment to government

-3-

and commercial insurances.

14.     Relators understood that they were employees of both DSCPC and NHCC
after Averil Johnson acquired DSCPC as a second NHCC location.

15.     On at least one occasion, Relator Imade was instructed by Johnson to
perform training at the NHCC 3330 S. Cobb. Dr. location.

## FEDERALLY FUNDED HEALTHCARE PROGRAMS

16.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.,* establishes
the Health Insurance for the Aged and Disabled Program, popularly known as the
Medicare program.  The Secretary of Health and Human Services ("HHS")
administers the Medicare Program through the Centers for Medicare and Medicaid
Services ("CMS").

17.     The Medicare program is comprised of four parts. Medicare Part A
("Hospital Insurance") provides basic insurance for the costs of hospitalization and
post-hospitalization care. 42 U.S.C. §§ 1395c-i-5. Medicare Part B ("Medical
Insurance") is a federally subsidized, voluntary insurance program that covers the
fee schedule amount for doctors' services, outpatient care, medical supplies, and
laboratory services, including facility dialysis treatments. 42 U.S.C. §§ 1395j--w-5.
Medicare Part C ("Medicare Advantage Plans") is a plan offered by private insurers
that contract with Medicare to provide Part A and Part B benefits. 42 U.S.C. §§

-4-

1395w-21--w-28. Medicare Part D ("Prescription Drug Coverage") is a plan offered by private insurers approved by Medicare to provide basic insurance for prescription drugs. 42 U.S.C. §§ 1395w-101--w-154.

18.     In order to receive Medicare funds, enrolled providers are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

19.     Among the rules and regulations which enrolled providers like Defendants agree to follow are to: (a) bill Medicare for only those covered services which are medically necessary; (b) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) comply with state and federal statutes, policies and regulations applicable to the Medicare Program; and (e) not engage in any illegal activities related to the furnishing of services to recipients.

20.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.* establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules,

however, each state decides who is eligible for Medicaid, the services covered,

payment levels for services and administrative and operational procedures.

21.     At all times relevant to this Complaint, the United States provided funds to

the States through the Medicaid program pursuant to Title XIX of the Social

Security Act, 42 U.S.C. §§ 1396 *et seq.* Enrolled providers of medical services to

Medicaid recipients are eligible for payment for covered medical services under

the provisions of Title XIX of the 1965 Amendments to the Federal Social Security

Act.

22.     In order to receive Medicaid funds, enrolled providers, together with

authorized agents, employees, and contractors, are required to abide by all the

provisions of the Social Security Act, the regulations promulgated under the Act,

and all applicable policies and procedures issued by the State.

23.     Pursuant to Chapter 601 of the Policies and Procedures for Physician

Services for Georgia Medicaid and PeachCare for Kids:

> Each enrolled physician agrees to bill the Division only for services that are
> rendered by the physician, or for services rendered under the physician's
> direct supervision. Only necessary and appropriate medical services that
> meet the following conditions will qualify as services performed under the
> direct supervision of the physician:
>
> A. The services must be performed by medical personnel who are authorized
> by law to perform the service, and who are qualified by education, training,
> or experience.

-6-

B. The person performing the services must be a salaried employee of the physician, or of the physician's group practice as defined below; physicians may not bill for the services of independent contractors.

C. The physician must periodically and regularly review the patient's medical records.

D. The physician must be immediately available on the site at the time the services are delivered, except as provided in Section 601.9.

E. A physician may not bill for services rendered by a person not approved to provide that service by Medicaid Policy, or by applicable licensure, certification, or other State or Federal Regulation.

24. Chapter 902 of the Georgia Medicaid Policies states that "Coding of both diagnoses and procedures is required for all claims."

25. TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

26. At all times relevant to this Complaint, DSCPC and NHCC were enrolled in, and sought reimbursement from Medicare, Medicaid, and TRICARE (collectively referred to herein as "Federal Insurance").

## FRAUDULENT SCHEMES

### *DSCPC is Operated by an Unsupervised Nurse Practitioner*

27.     That a medical care provider possesses the prescribed qualifications, adequate training, and professional credentials and proper level of supervision are material conditions to payment of claims by Federal Insurance. *See United States ex rel. Escobar v. Universal Health Servs.*, 842 F.3d 103, 111 (1st Cir. 2016) (citing *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2000 (2016)).

28.     Since at least September 2017, all medical services at DSCPC are being performed by a single, unqualified, unsupervised nurse practitioner, including diagnoses, procedures, and issuance of prescriptions.

29.     Upon information and belief, these services are being billed under Dr. Bryant, as if he were (at least) present and supervising.

30.     Since at least September 2017, all prescriptions for DSCPC patients are being ordered by medical assistants through DSCPC's EHR software, AdvanceMD, without any oversight by Dr. Bryant.

31.     On February 2, 2017, Dr. Bryant issued a memo at DSCPC "reminding" and "re-emphasizing" to the staff "DO NOT under any circumstances offer information

to any private or government agency or its representatives that requests any information about DSCPC."

32.     From approximately February 2017 through August 2017, Dr. Bryant would only appear at DSCPC sporadically.

33.     During that time, MAs worked at DSCPC and provided medical services to patients, including providing allergy services to its patients, without any physician supervision.

34.     In or about August 2017, Averil Johnson acquired DSCPC.

35.     Johnson held a meeting with the staff where he announced that an NP would be taking over for Dr. Bryant, who would not be seeing patients anymore.

36.     On or about September 5, 2017, nurse practitioner Tondra Ivey began working at DSCPC without physician supervision.

37.     NP Ivey does not have a Nurse Protocol Agreement on file with the state of Georgia, a requirement for any NP who is delegated authority by a supervising physician. *See* O.C.G.A. § 43-34-23, O.C.G.A. § 43-34-25, and Ga. Comp. R. & Regs. 360-32, 410-11-.13.

38.     Ms. Ivey had obtained her master's in nursing from an online university just prior to joining DSCPC.

39.   It did not appear to Relators that NP Ivey had any prior training or experience in dermatology, and NP Ivey received approximately 1-2 days of "training" from Dr. Bryant in September.

40.   Nevertheless, she was immediately thrust into the role of acting as the lone medical professional in the office, with primary responsibility for diagnosing patients and performing procedures.

41.   Dr. Bryant would come in on rare occasions in September, but by October he rarely came to the office and was in California much of the time.

42.   At first, Relator Imade assisted NP Ivey. When patients needed treatment, NP Ivey would ask Relator Imade what to do, and NP Ivey would usually follow Relator Imade's suggestion.

43.   This made Relator Imade very uncomfortable, as it was wildly inappropriate for her, an MA, to be telling the NP how a patient should be treated.

44.   Relator Imade and Relator Washington switched roles, so now Relator Washington was assisting in surgeries, but she refused to tell NP Ivey what she thought should be done.

45.   Much of the time NP Ivey would "wing it," meaning she would guess at procedures, diagnoses, and prescriptions.

-10-

46.    Relators were shocked by NP Ivey's inexperience and that she was essentially being allowed to learn on the job by cutting into actual patients with practically no supervision whatsoever.

47.    Relators witnessed NP Ivey performed procedures that she did not know how to perform, such as cyst removals.

48.    NP Ivey lacked basic knowledge as to what the various medical instruments were or how to use them.

49.    Relator Washington recalls being in procedures where there was blood all over the room from bad cuts and unsanitary procedures.

50.    After one procedure where it was clear that NP Ivey did not know how to perform the cut, a patient complained that he felt like a guinea pig.

51.    Infections were prevalent among the patients.

52.    NP Ivey performed in situ laser treatments on patients, a process that burns and destroys cancer cells. After one such procedure, NP Ivey admitted to Relator Imade that she could not remember how long she was supposed to use the laser.

53.    NP Ivey lacked the knowledge and experience necessary to render diagnoses. For example, NP Ivey instructed the staff to send biopsies to LabCorp for testing. When the staff asked her what diagnosis code to use, she said "put down anything," admitting that she did not know the diagnosis (or even what a diagnosis code was).

-11-

54.     On one occasion, a patient had an allergic reaction to an allergy test. NP Ivey did not know what to do and had to call in an MA to assist the patient.

55.     On one occasion, after using a scalpel to cut into a patient, NP Ivey accidentally cut herself and went into a panic.

56.     NP Ivey did not know basic OSHA and HIPAA protocols. For example, she would throw bloody surgical gloves into the regular trash and discuss private patient information in earshot of the waiting room.

57.     Simply put, NP Ivey was performing a job for which she was completely unqualified, and for which services were billed to Federal Insurance.

58.     Every member of the back office at DSCPC had log-ins with AdvanceMD that allowed them to order prescriptions for non-controlled substances without any physician supervision.

59.     Dr. Bryant and Averil Johnson instructed Relator Imade to use her log-in and order whatever prescriptions that NP Ivey requested, even after she told them she was concerned that the prescriptions were incorrect.

60.     Relators frequently complained to Dr. Bryant and Averil Johnson that NP Ivey was unqualified, was violating HIPAA and OSHA, was putting patients at risk, and that they feared the consequences if she botched a procedure.

-12-

61.     After being gone for the entire month of October and first half of November,

Dr. Bryant returned to the office on Friday, November 17 for some additional

"training". Relators again insisted to him that NP Ivey did not know what she was

doing and that the patients were being put at serious risk.

62.     Dr. Bryant spent approximately 2-3 hours training NP Ivey, and then left.

63.     The following Monday, Relators were told not to return to the office. After a

few days where it was unclear when they were supposed to come back, they were

given termination letters.

*Smyrna Office*

64.     The NHCC website advertises that it has an urgent care "team," primary care

"doctors," "specialists in cardiology," and "onsite dermatologists." None of this is

true.

65.     Relators understand that the Smyrna office of NHCC is operated the same

way as the Stockbridge location, with an unsupervised NP (Sajani Patel) and a team

of MAs, but no physician present in the office.

66.     NP Patel does not have a Nurse Protocol Agreement on file with the state.

67.     When Relator Imade was asked by Averil Johnson to go to NHCC to talk to

the staff about allergy testing, she only saw the nurse practitioner, MAs, and staff.

-13-

She asked who was the doctor in charge and was told that they would be speaking with Dr. Bryant later.

68.     Later, Johnson told her that another doctor had "left him hanging" and that he was trying to get the place working properly without him.

69.     Moreover, after DSCPC was taken over by Averil Johnson, all calls for medication refills at NHCC were forwarded to DSCPC and handled by MA Chenoa Rogers, who (under Johnson's orders) electronically submitted any non-controlled prescription refills requested by patients without any provider oversight.

70.     On one occasion, Relator Imade noticed while reviewing a patient's EHR that Rogers had refilled a patient's heart medicine for an incorrect dosage.

*Medically Unnecessary and Unsupervised Allergy Testing and Immunotherapy*

71.     DSCPC has performed allergy services on its patients since approximately 2013.

72. ·   Dr. Bryant, and now NP Ivey, would order the tests, and then MAs (including Relator Imade) would perform the testing, read the results, and perform immunotherapy.

73.     Most DSCPC patients whose insurance covers the tests receives an allergy test (about 9 out of 10 patients).

-14-

74.     Dr. Bryant instructed that these patients also all qualified for pulmonary function tests.

75.     Relator Imade cautioned Dr. Bryant that he was going to get in trouble for ordering allergy tests on patients coming in with hair loss problems, for example, but he disregarded her warnings.

76.     DSCPC performs and bills for allergy tests for each patient annually.

77.     Annual allergy testing is medically unreasonable and unnecessary.

78.     DSCPC routinely bills allergy testing under CPT Code 95004 for 70 units, but it only tests for 32 allergens.

79.     Once Dr. Bryant referred the patient to the MA for allergy testing, he generally was no longer involved in the allergy services process. The MAs were responsible for performing the test, reading the results, recommending immunotherapy, and performing immunotherapy. The MAs were told to recommend immunotherapy to every patient who showed a sufficient number of indications of allergies.

80.     More than half of DSCPC's patients ultimately agreed to immunotherapy.

81.     Patients return to DSCPC for immunotherapy on a weekly basis.

82.    Federal Insurance requires that immunotherapy services be billed using component billing, meaning one code for the professional service of injection (95115 or 95117) and separate coding for the antigens and their preparation.

83.    DSCPC bills for every immunotherapy injection under CPT Codes 95115 and 95165 (30 units per month when billing Medicare or Medicaid).

84.    CPT Code 95165, however, is for "professional services for the supervision of preparation and provision of antigens for allergen immunotherapy," meaning that "supervision" and "preparation" of antigens is required to bill under that code.

85.    DSCPC does not prepare the immunotherapy antigens, however; they were purchased pre-made from a vendor, via Averil Johnson, and MAs simply drew doses from those pre-made vials.

86.    Relator Imade estimates that between 25-50 treatments could come out of a single multi-dose bottle. Even if this could qualify for reimbursement under CPT Code 95165, Medicare billing guidelines state "A maximum of 10 doses per vial is allowed for Medicare billing, even if more than ten preparations are obtained from the vial." See Medicare Claims Processing Manual Chapter 12, Section 200.

87.    DSCPC performs and bills Federal Insurance for immunotherapy when Dr. Bryant is not present in the office to supervise, including from February 2017

-16-

through August 2017, when Dr. Bryant rarely was at the office, and since the NP took over the patients' care in September.

88.     Every patient receives the same course of universal immunotherapy, no matter what allergies they are found to have, the severity of the allergies, or the effectiveness of the treatment.

89.     Patients at NHCC receive the same universal immunotherapy, which is billed to Federal Insurance.

90.     Upon information and belief, Johnson also sells these same allergy services to other medical practices, who in turn bill them to Federal Insurance.

91.     Such universal immunotherapies that are in no way tailored to the individual patients' needs are medically unreasonable and unnecessary.

92.     Pursuant to Medicare Benefit Policy Manual, Chapter 15, Section 50.4.4.1: "Payment may be made for a reasonable supply of antigens that have been prepared for a particular patient if: (1) the antigens are prepared by a physician who is a doctor of medicine or osteopathy, and (2) the physician who prepared the antigens has examined the patient and has determined a plan of treatment and a dosage regimen. Antigens must be administered in accordance with the plan of treatment and by a doctor of medicine or osteopathy or by a properly instructed person (who could be the patient) under the supervision of the doctor."

-17-

93.    DSCPC performs allergy testing and immunotherapy on the same visit, and bills an E/M code for that visit.

94.    According to CMS guidance, allergy testing is not performed on the same day as allergy immunotherapy in standard medical practice. These codes should, therefore, not be reported together. Visits may not be paid with allergy injection services 95115 through 95199 unless the visit represents another separately identifiable service. LCD ID L34597.

95.    DSCPC also bills an E/M code each time a patient returns for immunotherapy treatment, even when that is the only purpose for their visit.

96.    Evaluation and management (E/M) codes reported with allergy testing or allergy immunotherapy are appropriate only if a significant, separately identifiable service is performed.

**COUNT I**
**Violation of 31 U.S.C. § 3729 – False Claims Act**
**(All Defendants)**

97.    Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

98.    As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented or caused to be presented numerous

false or fraudulent claims for payment or approval, in violation of the False Claims
Act, 31 U.S.C. § 3729(a)(1)(A).

99.    As set forth above, Defendants, individually and by and through their agents,
officers, and employees, knowingly conspired to defraud the Government by
getting a false or fraudulent claim allowed or paid, in violation of the False Claims
Act, 31 U.S.C. § 3729(a)(1)(C).

100.   Due to Defendants' conduct, the United States Government has suffered
substantial monetary damages.

101.   The United States is entitled to treble damages based upon the amount of
damage sustained by the United States as a result of the aforementioned violations
of the False Claims Act, 31 U.S.C §§ 3729-3733, in an amount that will be proven
at trial.

102.   The United States is entitled to a civil penalty as required by 31 U.S.C. §
3729(a) for each of the fraudulent claims.

103.   Relators are also entitled to reasonable attorney's fees and costs, pursuant to
31 U.S.C. § 3730(d)(1).

## COUNT II
### Violation of O.C.G.A. § 49-4-168.1 – State False Medicaid Claims Act
### (All Defendants)

-19-

104.   Relators hereby incorporate and reallege herein all other paragraphs as if fully set forth herein.

105.   As set forth above, Defendants, individually and by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the Georgia Medicaid program numerous false or fraudulent claims for payment or approval, in violation of O.C.G.A. § 49-4-168.1(a)(1)

106.   As set forth above, Defendants, individually and by and through their agents, officers and employees, conspired to commit a violation of the State False Medicaid Claims Act, in violation of O.C.G.A. § 49-4-168.1(a)(3).

107.   Due to Defendants' conduct, the State of Georgia has suffered substantial monetary damages.

108.   The State of Georgia is entitled to treble damages based upon the amount of damage sustained by the State of Georgia as a result of the aforementioned violations of the State False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, in an amount that will be proven at trial.

109.   The State of Georgia is entitled to a civil penalty as required by O.C.G.A. § 49-4-168.1 for each of the fraudulent claims.

110.   Relators are also entitled to reasonable expenses which the court finds to have been necessarily incurred and reasonable attorney's fees and costs, pursuant to O.C.G.A. § 49-4-168.1(i)(2).

## COUNT III
### Violation of 31 U.S.C. § 3730 – Retaliation Against Relator Imade
### (Defendants DSCPC and NHCC)

111.   Relators incorporate and reallege herein paragraphs 4-15 and 27-63 as if fully set forth herein.

112.   Defendants DSCPC and NHCC violated Relator Imade's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against Relator Imade for lawful acts done by Relator Imade in furtherance of an action under the False Claims Act and other efforts to stop one or more violations alleged in this action.

113.   As a result of DSCPC's and NHCC's actions, Relator Imade has suffered damages in an amount to be shown at trial.

## COUNT IV
### Violation of 31 U.S.C. § 3730 – Retaliation Against Relator Washington
### (Defendants DSCPC and NHCC)

114.   Relators incorporate and reallege herein paragraphs 4-15 and 27-63 as if fully set forth herein.

115.   Defendants DSCPC and NHCC violated Relator Washington's rights pursuant to 31 U.S.C. § 3730(h) by retaliating against Relator Washington for

lawful acts done by Relator Washington in furtherance of an action under the False

Claims Act and other efforts to stop one or more violations alleged in this action.

116.   As a result of DSCPC's and NHCC's actions, Relator Washington has

suffered damages in an amount to be shown at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relators pray for judgment:

(a) awarding the United States treble damages sustained by it for each of the

false claims;

(b) awarding the United States the maximum civil penalty for each of the

false claims and statements;

(c) awarding the State of Georgia treble damages sustained by it for each of

the false claims;

(d) awarding the State of Georgia the maximum civil penalty for each of the

false claims and statements;

(e) awarding Relators 30% of the proceeds of this action and any alternate

remedy or the settlement of any such claim;

(f) awarding Relator Imade special damages resulting from the retaliation

pursuant to 31 U.S.C. § 3730(h);

-22-

(g) awarding Relator Washington special damages resulting from the

retaliation pursuant to 31 U.S.C. § 3730(h);

(h) awarding Relators litigation costs and reasonable attorney's fees; and

(i) granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Julie K. Bracker
Georgia Bar No. 073803
Jason Marcus
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3225 Shallowford Road
Suite 1120
Marietta, GA 30062
Tel. (770) 988-5035
Fax (678) 648-5544
Julie@FCAcounsel.com
Jason@FCAcounsel.com